# EXHIBIT L

# MENDING THE INSURANCE SAFETY NET

*This article examines the insurance archaeology industry and its utility in locating valuable insurance policies that can help offset the costs associated with environmental liabilities.*

## 231.881 Introduction

As the millennium approaches, a look back one-third of a century, to the late 1960s, provides a useful perspective on the pace of technological and social change in the way Americans do business. Imagine, for a moment, that it's 1967. Not only personal computers, but office fax machines and overnight mail delivery are still in the future. More than 80 percent of the professional and executive work force wear ties and jackets to work every day — and shave every day, since over 80 percent are also male. Foreign competition, for most companies in most businesses, is a distant abstraction at most. Mergers are not exactly rare birds, but they are not on the horizon for the vast majority of businesses. The same is true for legal liability — whether for environmental cleanup, defective products or workmanship, or any other form of negligence, malfeasance, or mishap. If your company should face legal liability, its Comprehensive General Liability insurance policy is truly "comprehensive" — containing broad coverage terms and few exclusions.

Now flash forward to mid-year 1999. How many times has your company changed hands — or acquired new companies — since 1967? How many times has it relocated, or caused newly acquired subsidiaries to relocate in whole or in part? Count the liability threats that your company — or, if you are a government official, your municipality or other government entity —has faced or must be prepared to face. Be sure to include retroactive liability for the deeds and alleged deeds of all its acquisitions and predecessors. The list of actual or potential liability threats may include claims involving asbestos or environmental cleanup, perhaps for events that occurred decades ago; product liability, whether for implanted medical devices and pharmaceuticals, tainted beef or apple juice, leaking pipe fittings, or even scalding coffee; construction defects; repetitive motion stress or hearing loss; sick building syndrome; the Y2K bug or on-line intellectual property disputes. Suits that could cause crippling losses — or even the death of a company — can arise during almost any quarter.

Now consider the primary defense against these multiple threats — your company's insurance portfolio. Can you recall, or easily access, your company or government entity's complete current insurance portfolio, including essential endorsements, exclusions, and limits? What about historic coverage — stretching back 10, or 20, or 40 years — including the coverage possessed by predecessor companies? The exercise is not mental gymnastics for its own sake. Both liabilities and currently-accessible insurance coverage can extend backwards for decades. Recovering and organizing an historic insurance portfolio thus becomes an essential survival measure for virtually every organization in the United States— including corporations and partnerships, nonprofits, insurance companies, municipalities, and other government entities.

### (a) The Evolving Art of Insurance Archaeology

Over the past fifteen years, insurance archaeology has emerged — and evolved —to help companies and municipalities reconstruct the safety net they have woven for themselves over several decades. Insurance archaeology emerged as a specialized investigative discipline devoted to recovering lost insurance policies — or secondary evidence if the actual policy document was unrecoverable. In the 1990s, insurance archaeologists have broadened their services to include complete historical insurance audits, reconstructing historical coverage in its entirety for as far back as 50 years. This broadened scope was necessitated by the accelerating pace of merger and acquisition activity, as well as by the proliferation of insurance policy types, exclusions, and limits.

Insurance archaeology is, in a sense, a foster child of two superfund provisions that vastly increased the number of companies, institutions, and organs of government faced with government-mandated environmental response costs. The first is its imposition of "joint and several liability," which provides that each

* This article was written by Sheila Mulrennan and Michele Pierro, both with the New York-based Insurance Archaeology Group Ltd. Ms. Mulrennan is the founder and president of IAG and has more than 20 years of experience with the insurance industry in the United States and London, as a claims analyst and as an insurance archaeology specialist. Ms. Mulrennan has directed the recovery of more than $50 billion in previously unknown, prepaid insurance assets for policyholders. Ms. Pierro is the senior vice president of IAG and acts as IAG's research and project supervisor. She has made particular contributions in locating secondary evidence and has developed many specialized methods for investigating and reconstructing missing insurance policy records. Ms. Pierro also has specialized knowledge in the London insurance market.

[§231.881(a)]

Copyright © 1999 by The Bureau of National Affairs, Inc.
ISBN 1-55871-369-7

entity that bears any liability at all can be held responsible for cleaning up an entire polluted site. The result has been a maze of litigation that has accounted for, by conservative estimate, one-third of superfund cleanup costs to date. [1]

The second superfund provision that sent policyholders scrambling to recover lost policy documents is "retroactive liability," which imposes cleanup responsibility on corporations and their successors that allegedly contributed to a site's pollution at any time in the past. While joint and several liability vastly multiplied the number of corporations, small businesses, and municipalities staring down the barrel of potentially massive cleanup and legal expenses, retroactive liability inspired high-stakes treasure hunts for often decades-old insurance policies to cover decades-old liabilities.

Companies facing liability for pollution that occurred decades ago learned that standard commercial general liability (CGL) insurance policies are "occurrence-based" — that is, they *never expire* if damage is shown to have occurred within the policy period. CGL policies from the 1940s, 1950s, and 1960s are particularly valuable because they generally contain no pollution exclusions, no aggregate limits, and no limits to defense costs. Policies from the 1970s, which contain a so-called "sudden and accidental" pollution exclusion, are easier to apply to superfund liabilities than policies purchased after 1986, which contain a less ambiguous "absolute pollution exclusion."

Of course, the older a policy is, the less likely it is that policy documentation will be neatly tucked in a well-marked and easily accessed file cabinet. The ever-increasing momentum of corporate downsizing and merger and acquisition activity in the 1980s and 1990s, as well as the flight of many corporate headquarters from the northeast to the sunbelt, displaced both people and records and thus shortened institutional memory. With increasing frequency, insurance archaeologists were dispatched as raiders of the lost archive, tracking down the long-lost policy documents of long-forgotten predecessor corporations held liable, often decades after the fact, for manufacturing and disposal practices not understood at the time to be harmful.

Combining the techniques of a detective, an historian, a claims specialist and an excavator, insurance archaeologists have learned to cull through brokers'

slips, chase down retirees and descendants of former personnel, pore over accounting ledgers, search government archives, and venture into radon- or asbestos-contaminated vaults in search of old insurance policies.

In the past five to ten years, however, insurance archaeology has become far more than the dramatic search for a buried silver bullet. As companies dealt with the logistics of notifying and negotiating with scores of insurers over decades of coverage periods, insurance archaeology expanded to include organizing all the records, filling in gaps for missing and incomplete policies, and creating graphs to illustrate the entire portfolio of assets. As the potential legal liabilities faced by organizations of all types and sizes have continued to multiply, and as insurers have grown ever-more creative in finding grounds for denying claims, companies have increasingly recognized that a complete audit, recovery and organization of their past and present insurance policies is an essential "best practice" of risk management. With current and potential legal liabilities taking up an ever larger proportion of any company's risk portfolio, managing the insurance portfolio has become as essential as managing expenses, revenue, and assets.

### (b) The Pervasive Need for Insurance Archaeology

Insurance portfolio reconstruction and maintenance is essential not only for large manufacturers and retailers, but for any organization with a broad range of risk exposures and insurance coverages. Today, that means virtually any large organization. Over the past quarter century, environmental and asbestos claims, coupled with consumer activism on the product liability front, have, in the words of one insurance industry lawyer, "created a vast plaintiffs' coverage bar and a judicial, political, and information-gathering network that thrives on a third wave of new tort claims." [2] Potential future sources of mass tort liabilities include implanted medical devices, Y2K suits and other "techno torts," government hazardous products suits, sick building syndrome, and workplace liability.

While liability risk is all but universal, different kinds of enterprises impose their own particular needs and areas of focus. The pages that follow will

---

[1] Ruth Gastel, "Environmental Pollution: Insurance Issues," *III Insurance Issues Update*. June, 1998, p. 1.

[2] Thomas Brunner, "What's Coming: The 'New' Long Tail Torts and Emerging Insurance Coverage Issues," Mealey's Environmental Reinsurance Conference, Nov. 17-18, 1997, quoted by James Veach, "Reinsuring Environmental Claims: A Snapshot," Mealey's Environmental Claims Journal, 10.3 Spring 1998, p.23.

outline the needs and problems particular to organs of government and insurance companies — as well as to mergers and acquisitions, which create their own impetus for auditing insurance.

### (1) Dumped On: Municipalities, Superfund and Old CGLs

When it comes to superfund liability for environmental cleanup, municipalities and other local government entities have been left literally holding the bag. Under superfund provisions, cities, towns, and counties whose "pollution contribution" consisted of no more than trucking ordinary garbage to local landfills have found themselves "jointly and severally liable" for decades' worth of toxins dumped, leaked, and emitted by businesses and private citizens within their jurisdiction.

Like the corporations and small businesses that did the bulk of the polluting, municipalities and other local government entities — including water and sewer authorities, transportation authorities, and school districts — have been caught in a web of litigation that has accounted for at least one third of superfund cleanup costs to date. According to the National Association of Counties, cities, towns, school districts, and counties have been the targets of more than 750 lawsuits filed by private superfund defendants seeking to minimize their own cleanup liability.[3] Moreover, counties, cities, and towns have been named by the Environmental Protection Agency as owners or operators at approximately 100 co-disposal landfills on the National Priorities List.

Last year, the EPA provided municipalities with an incentive to resolve their legal entanglements and get on with the business of cleaning up potential hazards to protect their citizens' health. An EPA policy released in February 1998 offers owners and operators of co-disposal landfills, and generators and transporters of municipal solid waste — i.e., municipalities — a formula for fair settlement of their superfund liabilities, setting a "baseline presumption" of municipal responsibility of 20 percent of total response costs. Though EPA regional offices are not bound by this baseline, the proportion of costs allocated to municipalities generally cannot exceed 35 percent. Therefore, the time is ripe for many municipalities to settle their liabilities and get on with cleanup.

Unlike corporations, government entities labor under a double mandate: to protect their citizens' health and to provide maximum value on the tax dollar. To fulfill the latter goal, municipal officials must aggressively pursue insurance coverage for environmental cleanup costs. Due diligence in this regard can serve taxpayers as surely as increasing the tax base or reducing government expenditures, because the possibility of recovering millions or tens of millions of dollars in cleanup costs is very real.

According to most state courts that have ruled on the issue, policyholders liable for environmental damage are entitled to insurance coverage not only under the policy that was in effect at the time when damage was first discovered, but also under every policy in effect during the often decades-long period when damage was silently occurring.[4] Thus, if environmental damage occurred over a long time, a municipality (or any other party deemed liable for pollution) may be entitled to coverage for both defense and indemnity under multiple, even scores of, insurance policies.

Conversely, when the damage extends over many years, some courts require the costs to be allocated over all of the relevant insurance policies, which means that gaps in the coverage history may force a municipality to pay for a considerable portion of the damage. Therefore, an historical insurance audit that reconstructs the municipality's entire insurance history over the past half century is essential.

CGL policies written before 1973, when the first generation of pollution exclusions became standard, provide the broadest coverage for environmental liabilities. However, policies written in the 1970s and early 1980s are often interpreted by the courts in favor of policyholders seeking coverage for pollution liabilities. That's because the so-called "sudden and accidental" pollution exclusion, which became the standard in the early 1970s until replaced by the so-called "absolute pollution exclusion" in 1986, has been interpreted by many state courts to exclude only *expected* or *intended* pollution.[5]

---

[3] National Association of Counties (NACO) press release, "Counties Win Six-Year Battle for Superfund Liability Relief," July 22, 1997.

[4] *Pittston Company v. Allianz Insurance Co.*, 905 F. Supp. 1279 (D.N. J. 1995); *Harleysville Mutual Insurance Co. Inc. v. Sussex County, Delaware*, 831 F. Supp. 1111 (D. Del. 1993); *Mustang Tractor & Equipment v. Liberty Mutual Insurance Co.*, 1993 WL 566032 (S.D. Tex. 1993) *affirmed by* 76 F.3d 89 (5th Cir. 1996).

[5] *Hecla Mining Co. v. New Hampshire Insurance Co.*, 811 P.2d 1083 (Colo. 1991); *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 607 N.E.2d 1204 (Ill. 1992); *Morton International Inc. v. General Accident Insurance Co.*, 629 A.2d 831 (N.J. 1993); *St. Paul Fire & Marine Insurance Co. v. McCormick &*

Copyright © 1999 by The Bureau of National Affairs, Inc.
ISBN 1-55871-369-7

### (2) Sauce for the Gander: Insurance Archaeology for Insurance Companies

Fundamentally, insurance companies need insurance archaeology for the same reason all other corporate and governmental entities need it: *liability loves company*. Large-scale litigation generally involves multiple defendants seeking defense and indemnification from scores or even hundreds of insurers. What's sauce for the goose is sauce for the gander: just as policyholders seek to maximize recovery by pursuing all possible insurers, insurance companies also seek partners in risk.

Take, for example, a case of large-scale environmental pollution, in which alleged contamination of ground, air, or water took place over many decades. Under "trigger of coverage" theories promulgated by some state courts, liability may extend from the moment damage occurred through the moment damage manifested itself — sometimes an interval of decades. Clearly, where other insurers are on the hook, it can be as cost effective for an insurer to establish the full range of the policyholder's coverage as it is for the policyholder to do so.

Insurance companies often turn to insurance archaeologists to find evidence of reinsurance coverage that will maximize recovery for environmental and toxic tort claims they have paid to policyholders. Since older reinsurance contracts, like older CGL policies, provide broader coverage, reconstructing any missing contracts with reinsurers can be as crucial for insurance companies as recovering lost policies is for policyholders.

Finally, insurance companies are far more than simply insurance providers. They are large conglomerates subject to virtually every form of liability exposure, resulting from acquisitions, real estate holdings, investment activity, fiduciary duty, information systems that create Y2K exposure, and the full range of other risks facing diverse enterprises.

### (3) Due Diligence: Insurance Archaeology in Mergers and Acquisitions

A company currently considering a merger or acquisition should make an historic insurance audit of the target company part of its due diligence before the deal is closed. United States courts have generally held that a corporation deemed liable for a predecessor's products or pollution is entitled to coverage under the predecessor's applicable insurance

---

*Baxter Creosoting Co.,* 923 P.2d 230 (Or. 1996).

policies. [6] Given this broad transferability of insurance policies to corporate successors , a comprehensive audit of a potential acquisition's insurance coverage can spell the difference between acquiring a dynamic asset or acquiring a perpetual asset drain. Assessing a target company's insurance coverage, therefore, is an essential part of due diligence for any prospective purchase or merger.

If a company has merged or acquired other companies in its past, the likelihood increases that insurance documents have been misplaced or forgotten — since changes of ownership generally entail changes in personnel, closing and merging of offices and warehouses, and sometimes even wholesale relocation.

The historic audit needs to be particularly comprehensive when a company is purchasing a division or subsidiary, which may share insurance policies with its parent and which may have gone through several ownership changes in the decades prior to the current purchase. In such a case, if the division or company has substantial liabilities, many entities may be competing for coverage up to the limits of each relevant insurance policy. Thus, the insurance audit must include as complete a record as possible of claims settled, claims pending, and remaining coverage available under the limits of each policy.

Ideally, a company considering a merger or acquisition should perform a complete historic coverage audit as soon as possible once negotiations begin. A demand for such an audit need not seem a distraction or intrusion, if it is made clear to the prospective partner or seller that the audit may well uncover assets that enhance the seller's value. Indeed, the seller may be induced to perform the audit, because doing so potentially augments its saleable assets. Selling a company with a complete and well-documented insurance history is like selling a house with a new roof and solid foundation.

Conducting the insurance audit prior to purchase is important not only because it provides the purchaser with data potentially crucial to assessing the seller's true value, but because the conditions for such an audit are much more favorable before the purchase than after. A merger or acquisition inevitably creates some disruption — and often considerable resentment, particularly when major personnel changes result.

---

[6] *Chatam Corp. v. Argonaut Insurance Co.,* 70 Misc. 2d 1028 (N.Y. 1972); *Aetna Life & Casualty v. United Pacific Reliance Insurance* 508 P.2d 230 (Utah 1978); *Paxton & Vierling Steel Co. v. Great American Insurance Co.,* 497 F. Supp. 573 (D. Neb. 1980).

**[§231.881(b)(3)]**

Since the merger and acquisition process has a momentum of its own, and circumstances often do not allow adequate time to reconstruct the past coverage in detail, the buyer can still prepare to do a complete audit following the purchase and thus prevent a "worst case scenario" in the years ahead. A partial audit can provide an outline of existing coverage and at least "freeze" the evidence, ensuring that critical documentation will not be misplaced, lost, or destroyed.

At a minimum, then, a prospective purchaser ought to obtain copies of all existing liability policies and identify what gaps exist in the coverage history while negotiations are in progress. In order to complete the audit after the acquisition, a company can take advantage of the leverage that exists before the purchase to locate records and obtain cooperation from employees. A checklist can be developed of the target company's insurance and relevant non-insurance records. Interviews with key personnel will also be invaluable in identifying both internal and external records.

### (c) The Historical Insurance Audit

Whether a company conducts an insurance audit using internal resources or hires an insurance archeology firm, the examination of existing, readily available records will very likely lead the auditors down a winding trail in search of coverage gaps. The following is an outline of the process as it has evolved over the past two decades.

#### (1) Marshal Existing Assets

- It is advisable to begin an audit by pulling and organizing all existing primary and excess liability policies or secondary evidence of coverage. Detailed examination of the documentation will probably reveal gaps and discrepancies in information. Surprisingly, policies are often discovered that were not considered missing since they had not appeared on any lists. This exercise alone may add millions of dollars to the pool of available insurance.

- Once policy records are organized, a chart of the coverage that has been identified should be prepared. Color can be used to illustrate the type of documentation available for each policy so that it is easy to see where additional research is necessary for missing or incomplete policies. The advantage of a visual presentation lies chiefly in the immediacy with which priorities for

further research can be identified and the possible monetary results quantified.

- Once the valuable assets have been painstakingly assembled, working copies should be made and the original records preserved in fire proof vaults or file cabinets.

#### (2) Research Missing or Incomplete Policies

##### Investigate Internal Sources

- Indices of various corporate departments should be reviewed to identify those non-insurance records which could either document missing policies or provide leads to possible outside sources of records.

- In the course of reviewing the corporate records, any possible external sources of records, such as brokers or outside counsel, should be identified.

##### Interview Key Personnel

- Interviews with former employees and brokers can establish their recollection of the missing insurance policies and the internal procedures for records retention. Leads can also be developed to outside sources of information, such as former brokers as well as state and federal government departments that may have required insurance documentation.

##### Expand the Search to Outside Sources

- Domestic retail and surplus lines brokers should be contacted for records relating to any missing or incomplete policies.

- If any Lloyd's policies are missing, information can often be obtained from the London correspondents of the domestic brokers. Due to Lloyd's dominance in the North American insurance markets over many decades, the records maintained by the London brokers are often repositories of a wealth of documentation of primary and excess coverage.

- Other priority outside sources identified in the internal records and interviews, including additional insureds, outside counsel, auditors, government agencies, and financial institutions can also produce a variety of documentation for the missing policies.

- If evidence that a lost policy existed can be clearly established, a sample of the standard form for the lost policy can assist in reconstructing the terms and conditions.

#### (3) Understand the Program At a Glance

**[§231.881(c)(3)]**

Copyright © 1999 by The Bureau of National Affairs, Inc.
ISBN 1-55871-369-7

By this point, corporate managers will typically have assembled thousands of pages of records relating to hundreds of policies issued over several decades. Understanding the complexities of an historic insurance program as well as the pre-acquisition coverage of numerous predecessor companies is the primary objective of an historic insurance audit. The savings in time and money will be exponential if the following steps are taken:

- Analyze key policy terms and conditions, such as pollution exclusions, application of aggregate limits, and notice provisions;
- Create a database that is flexible enough to accommodate lengthy text and to search based on customized search criteria;
- Illustrate the analysis of the key policy terms in a bar graph chart which can then be used to formulate a strategic approach to claims handling;
- Once a coverage chart is compete, it is not unusual for the total cumulative policy limits to exceed $1 billion. The graphic illustration of a total portfolio of historic insurance, such as the one in the illustration on the following page, can dramatically convey the magnitude of potential recovery to senior management. Ultimately the chart will save thousands of hours of staff time and streamline negotiations with insurers.

### (d) Pre-Millennial Urgencies

Two current factors add urgency to the task of recovering, preserving and structuring an organization's historic insurance portfolio. One is the rapid consolidation of insurance brokerages in recent years. The second factor is even more time-sensitive: a document-destruction time bomb scheduled for Y99.

### (1) The Disappearing Broker

In the past, companies seeking to reconstruct their insurance histories when their own document record was incomplete could rely heavily on brokers who had sold them the policies. Today, a decade's worth of consolidation in the insurance brokerage industry means that brokers themselves can be almost as hard to trace as insurance policies. Not only have the top

ten brokers of ten years ago combined into a "big three" (New York-based Marsh & McLennan, Chicago-based Aon Risk Services, and Willis Corroon Group of London), but one out of every three agencies with revenues of more than $5 million acquired another agency in the past year.[7] Since many smaller brokerages are run by aging partners, small acquisitions often trigger the retirement of brokers with decades of memory and records.

### (2) Millennial Math: 9/9/99 = 0

When it comes to records recovery, Y2K's shadow stretches forward into this year. In corporations throughout the United States, 1999 has long been the most popular year, and 9/9/99 the most popular date, to mark records for destruction. Since the 1960s, multiple nines have served as "null value" codes in the date fields of many document management programs — and many human minds seem to have taken the cue, choosing 1999 as a once-comfortably-distant scheduled destruction date. In their daily work, insurance archaeologists encounter this millennial time bomb in page after page of records management indices in virtually every industry — including the insurance industry. A true crisis thus looms in records retention. Now more than ever, to postpone research of historic insurance records may mean consigning valuable coverage to oblivion.

### (e) Negotiate From Strength

It is a reality in corporate America that few large insurance claims go undisputed. The best response is to be prepared for the inevitable and remember that you may have to manage negotiations simultaneously with scores of insurance companies regarding hundreds of policies. The policyholder who has immediate access to its entire coverage history is ready to respond effectively to an insurance company's challenges. But most important, the insurance company will have lost its best defense — the unprepared policyholder.

---

[7] John Leming, "Going for Broke(rs) in Insurance," Journal of Commerce, Nov. 30, 1998, p. 6A, based on Insurance Agents of America, "Annual Update of Best Practices Operational Analysis and Financial Performance Benchmarks," 1998.



Copyright © 1999 by The Bureau of National Affairs, Inc.
ISBN 1-55871-369-7

4-99

Case 3:11-cv-00491-JBA   Document 141-12   Filed 07/05/17   Page 9 of 10

# BUSINESS INSURANCE.

# Ways to track down an old insurance policy

Posted On: Mar. 15, 2009 12:00 AM CST

## Nick Whitfield

If a business cannot locate its original insurance policy documents, there still are options to win a policy dispute.

Courts place the burden of proving a policy's existence on the policyholder, meaning a would-be claimant has to produce prima facie evidence of a policy. Obviously, the policy itself is ideal, but several other forms of evidence can be used to meet that burden.

"Every jurisdiction has its own rules about how you prove up documents, but it's a preponderance-of-evidence standard," said Jill Berkeley, a Chicago-based partner with Howrey L.L.P. and co-chair of the firm's national insurance recovery practice.

"I'm sure they exist, but I can't think of a single case, in 30 years of my experience, where we didn't find some evidence of coverage," said Jerrold Oshinsky, a partner with Gilbert Oshinsky L.L.P. in Washington.

There are several places to begin a search, either for long-lost policy documents or for secondary evidence to establish a policy's existence, placement and terms.

"First off, I do a historical analysis of all the people who have had that (insurance buying) position and start interviewing them," Mr. Oshinsky said. "One client of mine called a retired risk manager, and he had a box sitting in his house with all of their old policies. You just never know."

Brokers, who generally retain copies of the policies they place, are another potential source of missing documentation. Brokers, however, are not required to keep policies indefinitely.

"We, as brokers, may maintain documents longer for one client than for another, per agreements with the client," said Robert N. Lane, senior counsel and executive vp with Willis (Bermuda) Ltd.

Even if the policy itself cannot be found, the policyholder's burden can sometimes be pieced together through a variety of secondary evidence.

Accounting records often include payments to insurers, which can establish which carrier issued the policy, when the policy was in effect and, in some cases, a policy number. "If a check has one of a carrier's policy numbers on it, that can shift the burden back to the carrier," said Curtis D. Porterfield, a partner with Howrey in Los Angeles.

Records of other claims activity from the relevant period also can offer a clue as to what carrier handled a company's risks at the time. "Find out if your company has ever been sued," said Mr. Oshinsky. "Find out who the lawyers were, and who paid their bills. That might give you the name of the carrier."

Workers compensation records also can be valuable. Because they generally are maintained by the state, these records have the added advantage of not being subject to the vagaries of corporate recordkeeping.

"There's a good chance that whoever was carrying your workers comp coverage in the '60s, for example, was also your liability carrier," Mr. Oshinsky said.

Another potential source of policy information is the London insurance market. Many London brokers have detailed record-keeping practices, Mr. Oshinsky said, and still might have records that no longer can be found in the United States.

Once a policy's placement is known, the next step is to establish the policy's terms.

For standard-form general liability policies, a policyholder may only need to prove what carrier issued the policy, its limits and the policy period, Mr. Porterfield said. Depending on the circumstances of the case, that may be enough to place a burden on the carrier to prove the policy in effect included any exemption that was not part of the standard form.

There is a small industry of insurance archaeologists--professionals who make a living piecing together fractured insurance histories.

"You can look to an archaeological firm to recreate what happened and what the policy said, and there are good firms out there that do that," Mr. Lane said, "but it's expensive."

"There's always a fairly decent chance," said Michele G. Piero, executive vp of Insurance Archaeology Group, a New York-based insurance archaeology firm. "A lot of it depends, obviously, on the record-keeping practices of the company, but there are outside sources, too. If a company doesn't have records, but they're in a business where they've always had a lot of claims, for example, then they might have a good paper trail anyway."

---